Argued and submitted April 11, affirmed May 27, 1980

# GILLIS,
*Respondent,*
*v.*
# CITY OF SPRINGFIELD, et al,
*Appellants.*

## (No. 78-7130, CA 14918)

611 P2d 355

Scott M. Galenbeck, Springfield, argued the cause and filed the briefs for appellants. With him on the briefs were Lively, Wiswall, Svoboda, Thorp & Dennett, Springfield, Joseph J. Leahy, Springfield, and Harms, Harold & Leahy, Springfield.

Harold D. Gillis, P.C., Eugene, argued the cause and filed the brief for respondent.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

CAMPBELL, J.

## CAMPBELL, J.

On September 5, 1978, the City of Springfield granted Pacific Builders' (Builders) request that certain real property in North Springfield be rezoned from RA Suburban to RP Residential-Professional to allow the construction of an office building. Subsequently, Harold Gillis, a resident of and property owner in North Springfield, petitioned in the circuit court for a writ of review challenging the rezoning. In a letter opinion, the circuit court overturned the City's action, ruling that the RP designation does not comply with the comprehensive plans applicable to the area and that the findings with respect to other available property were inadequate. On appeal, Builders assigns both of these rulings as error. We affirm.

Two comprehensive plans are in effect in the area in question: the Eugene-Springfield Metropolitan Area 1990 General Plan (1990 Plan),[1] adopted in 1972 and amended in 1976, and the North Springfield Community Plan (NSCP), adopted in 1973. The 1990 Plan

> "* * * consists of statements of goals and recommendations and accompanying illustrations to guide the development of the metropolitan area. The plan indicates how the various elements of the metropolitan community can be developed in order to attain the compact growth form consistent with achievement of the General Plan Goals." 1990 Plan at 5.

In its Introduction, the 1990 Plan states:

> "[T]he General Plan is not a zoning ordinance or a blueprint for the specific development of particular buildings, highways and so on. Such specific recommendations would soon be outdated. Instead, the General Plan presents a number of broad development guidelines. Some specific details are provided, but they serve as illustrative examples of possible applications of the guideline policies rather than as fixed decisions. The policies can be applied to individual projects or area plans conceived by local government agencies or private developers. In other

---

[1] Aspects of this plan were discussed in *Green v. Hayward,* 275 Or 693, 552 P2d 815 (1976).

words, the General Plan, which is long-range, comprehensive and focused on physical development, provides a flexible guide for specific developmental decision making. It does not, in itself, set down the decisions." 1990 Plan at 2.

The 1990 Plan further explains that specific proposals related to neighborhood and community facilities are more appropriately left to more detailed community plans. The NSCP, as stated in that document,

"is intended to be a specific enunciation of the goals and guidelines set forth in the 1990 General Plan. Whereas the General Plan established a direction for the Eugene-Springfield metropolitan area by focusing on a consistent set of goals and policies which were officially endorsed by the jurisdictions involved, *the* North Springfield Plan *attempts to make application of these goals and policies as they relate to particular local findings."* NSCP at 4 (emphasis in original).

In its Metropolitan Area Plan Diagram, the 1990 Plan designates the area in question as Medium Density Residential, defined as containing 11 to 20 dwelling units per acre. The area has the same designation under the NSCP, which defines medium density as 10.1 to 15 dwelling units per acre.

Among the uses permitted outright in an RP zone under Section 13.02 of the Springfield Zoning Code are: clinics, data processing offices; laboratories; offices for accountants, attorneys, physicians, engineers, architects, insurance brokers, lumber brokers, realtors, stock brokers and other professionals; studios for artists, photographers and interior decorators; telephone answering services; and secretarial services. Homes for the aged and nursing homes are the only residential uses permitted in an RP zone. A number of other types of buildings and uses are permitted conditionally, including barber shops and beauty parlors, hospitals, and general office use excluding retail activities. Duplexes, multiple family dwellings, planned unit developments, and group care homes all require a conditional use permit. All buildings in an RP zone are

subject to various requirements as to setback, height, lot area, lot coverage, parking, fences, and signs.

Petitioner argues that the RP zoning is inconsistent with a medium density residential classification of the property under the comprehensive plans. In contending otherwise, Builders offers two major points. First, Builders argues that § 13.01 of the Springfield Zoning Code, quoted below at 395, is a legislative determination by the City of Springfield that the RP zone is compatible with residential areas, which determination is entitled to a full presumption of validity and subject to challenge only upon constitutional grounds for an arbitrary abuse of authority. *Fasano v. Washington Co. Comm.,* 264 Or 574, 507 P2d 23 (1973). Second, the developer notes that due to the setback requirements, height limitations, and similar restrictions listed above, the intensity of use of property within an RP zone will be comparable to that in certain other residential classifications in the Springfield Zoning Code and, therefore, the zone change complies with the rule of *Baker v. City of Milwaukie,* 271 Or 500, 533 P2d 772 (1975), that a zoning ordinance must not allow a more intensive use than that prescribed in the comprehensive plan.

We first address the question, raised by petitioner, whether the comprehensive plan designation of the property as residential permits any use of the property other than for dwellings. Petitioner suggests that the absence of any specific language in the comprehensive plans permitting anything other than residential uses in residential areas mandates the conclusion that non-residential uses are prohibited in such areas. We disagree with this overly narrow reading of the comprehensive plans. As seen above, the 1990 Plan expressly negates the idea that it represents specific land-use decisions. Rather, that plan sets down "broad criteria used to locate the *general categories of land use,* public facilities of metropolitan-wide importance, and transportation." 1990 Plan at 5 (emphasis added). Three general categories of urban land use appear in

the 1990 Plan: residential, commercial, and industrial.[2] The 1990 Plan leaves room for communities to refine sub-categories within these general categories. Community plans also have latitude to "offer detailed proposals related to neighborhood and community facilities." 1990 Plan at 17. This language indicates that the 1990 Plan contemplates the placement of certain non-residential neighborhood-oriented facilities, such as schools, parks, libraries, and fire stations, in residential areas. The NSCP encourages the location of parks, schools, and open spaces within residential developments. That plan also urges the use of planned unit developments (PUD's) in residential areas where appropriate. The concept of a PUD frequently includes the provision of a variety of commercial services as well as residential and recreational uses for the residents of the development. *See generally Frankland v. City of Lake Oswego,* 267 Or 452, 517 P2d 1042 (1973); Symposium, Planned Unit Development, 114 Pa L Rev (1965). Thus, the comprehensive plans do not prohibit all non-residential uses in residential areas.

The ultimate question is not, however, whether an isolated office building is permitted in the area under the comprehensive plans, but whether the RP zone is consistent with the land use designation for the area. We turn to Builders' contention that the local legislative body has already made that determination in Section 13.01 of the Springfield Zoning Code, a decision subject only to constitutional attack.[3]

Section 13.01, the "Description and Purpose" of the RP zone, states:

---

[2] The plan also lists other types of land use, including agricultural, rural, and forest.

[3] In this context it is somewhat curious that among the findings of fact adopted by the Springfield Planning Commission following the Commission's decision to recommend to the City Council approval of the rezoning is the statement "It was found that there was an error made in the Comprehensive Plan." The principal defect noted was that the plan was not site specific as to the particular lot.

> "The RP Residential-Professional district provides for a desirable mixing of residential land uses with professional office uses in possible close proximity to adjacent residential areas. The professional office uses permitted are intended to be comparable in terms of scale, bulk, building and parking coverage, traffic generation, open space and other external factors with the residential uses permitted. This district may be appropriate in the transition areas between major land uses as indicated in the adopted plan."

The first sentence of this section may be treated as a finding by the local legislative body that a mixture of *certain* residential land uses with professional office uses is desirable, particularly in "possible close proximity to *adjacent residential areas.*" (Emphasis added.) We observe, however, that homes for the aged[4] and nursing homes[5] are the only residential uses permitted outright in the RP district. Therefore, the finding of the desirability of the mixture of land uses only applies to those limited institutional residential uses. The requirement of a conditional use permit for other residential uses in an RP district, such as duplexes, multiple family dwellings, and planned unit developments, is a legislative declaration that such uses possess "such unique and special characteristics as to make *impractical* their being included as outright uses in any of the various districts herein defined." Springfield Zoning Code § 25.01 (emphasis added). The vast majority of permitted uses in the district are office and similar uses, excluding retail activities, of

---

[4] "Home for the aged" is defined in the Springfield Zoning Code as "any home or other institution that maintains facilities for rendering board and domiciliary care for compensation to three (3) or more persons who are of the age of sixty-five (65) years who by reason of infirmity require domiciliary care."

[5] "Nursing home" is defined in the Springfield Zoning Code as "any home, place or institution which operates and maintains facilities providing convalescent or chronic care, or both, for a period exceeding twenty-four (24) hours for two (2) or more ill or infirm patients not related to the nursing home administrator or owner by blood or marriage. Convalescent and chronic care may include, but need not be limited to the procedures commonly employed in nursing and caring for the sick."

the same type permitted outright in certain commercial districts under the Springfield Zoning Code.[6] In light of these facts, we do not interpret the City's finding that the RP district is compatible with *adjacent* residential areas as equivalent to a statement that the RP zone is of a residential character. The use of the phrase "adjacent residential areas" implies that the City considered the RP district as something other than residential.

Although, as we have stated, the comprehensive plans do not exclude all nonresidential uses from those areas designated "residential," we believe that that designation requires at least that the area be zoned so that residential uses predominate.[7] The City of Springfield's RP district lacks this essential feature.

The next question raised by Builders is whether the fact that the intensity of use in an RP district is comparable to that in certain residential districts in Springfield may transform this predominantly commercial district to a district possessing a residential character.[8] Builders draws upon brief excerpts from *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 581 P2d 50 (1978), *Baker v. City of Milwaukie,* 271 Or

___

[6] As Builders observes, many of these same uses are also permitted conditionally in Springfield's R-3 Multiple Family Residential District, which allows approximately 36.3 dwelling units per acre, and in the R-4 High Density Multiple Family Residential District, which allows nearly 109 dwelling units per acre.

[7] By way of comparison with the Springfield Zoning Code and with no intention of demonstrating our approval of the following ordinances, we note that under the RP district provided for at Sections 9.392 to-.398 of the Eugene Code, duplexes, multiple family dwellings, planned unit developments, and single-family dwellings are permitted outright. Under the RP district provided for at Sections 10.150-10 to -28 of the Lane Code, single-family dwellings, duplexes, multiple dwellings, court apartments, boarding houses, and townhouses are permitted outright.

[8] Builders points out that an examination of the particulars of the zoning code demonstrates that there is no significant difference between the intensity of use permitted in the RP district and that in the R-2 Limited Multiple Family Residential District, Article 8, Springfield Zoning Code. We note that both RP and R-2 permit approximately 17.4 dwelling units per acre, in excess of the 15 dwelling units per acre permitted by the NSCP Medium Density Residential designation.

[396]

500, 533 P2d 772 (1975), and *Marracci v. City of Scappoose,* 26 Or App 131, 552 P2d 552 (1976), in an attempt to show that (1) the intensity of use is of equal importance to the type of use in determining the specific character of a zone, and (2) under the cases cited the RP district complies with the comprehensive plans. Builders first points out that *Baker* held that "a zoning ordinance which allows a more intensive use than that prescribed in the [comprehensive] plan must fail." 271 Or at 514. *Fifth Avenue,* as Builders further notes, cited *Baker* for that limited proposition. Finally, Builders cites language in *Marracci* stating that *Baker* "does not stand for the proposition that every land-use determination must at all times literally comply with the applicable comprehensive plan." 26 Or App at 133.

*Baker* involved a dispute over, *inter alia,* a zoning ordinance that allowed 39 dwelling units per acre when the applicable comprehensive plan allowed only 17. The type of use was not in issue. Thus, *Baker* does not hold that the type of use is irrelevant so long as intensity of use is comparable to that allowed in the comprehensive plan.

In *Marracci,* the plaintiff petitioned for a writ of review after the defendant city denied the plaintiff's request for a conditional use permit to build multiple-family housing. The applicable comprehensive plan designated the plaintiff's property as "higher density residential." The trial court ruled for the plaintiff, reasoning that since the comprehensive plan contemplates the eventual intensity of use proposed by the plaintiff, the denial of the conditional use permit conflicts with the comprehensive plan. On appeal, we reversed, holding:

> "[A] comprehensive plan only establishes a long-range maximum limit on the possible intensity of land use; a plan does not simultaneously establish an immediate minimum limit on the possible intensity of land use. The present use of land may, by zoning

ordinance, continue to be more limited than the future use contemplated by the comprehensive plan." 26 Or App at 134.

The language quoted by Builders, placed in this context, does not stand for the proposition that the type of use called for in the comprehensive plan may be ignored.

We conclude that the RP district does not comply with the comprehensive plan designation of Builders' property. As a result, we do not address Builders' other assignment.

Affirmed.